

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| KINDERGARTNERS COUNT, INC.,        ) | |
|        ) | |
| Plaintiff/Counterclaim Defendant, ) | |
|        ) | |
| vs.        ) | **Case No. 00-4173-JAR** |
|        ) | |
| DONALD F. DEMOULIN        ) | |
|        ) | |
| Defendant/Counterclaim Plaintiff, ) | |
|        ) | |
| and        ) | |
|        ) | |
| TELEPHONE PIONEERS OF AMERICA,        ) | |
| and PIONEER FOUNDATION,        ) | |
|        ) | |
| Defendants,        ) | |
|        ) | |
| vs.        ) | |
|        ) | |
| VERNIE L. WHEELER,        ) | |
|        ) | |
| Counterclaim Defendant.        ) | |

**PLAINTIFF'S TRIAL BRIEF**

## I.    NATURE OF THE CASE.

This case arises out of the misconduct of the defendants in breaching their respective contracts and fiduciary duties to plaintiff and stealing and secretly developing a competing personalized program to that owned by Plaintiff. Plaintiff Kindergartners Count, Inc. ("KCI") has brought suit against Telephone Pioneers of America ("TPA") and Donald F. DeMoulin ("DeMoulin")

for copyright infringement, unfair competition, breach of contract, breach of fiduciary duty, tortious interference, and fraud seeking compensatory and punitive damages, as well as appropriate injunctive relief, for the defendant's wrongful conduct.    KCI has further sued Pioneers Foundation ("Foundation") on an alter ego theory claiming that TPA and the Foundation are essentially one and the same entity.  The claims arise out of the contractual and fiduciary relationships of the respective parties.  Further, the claims arise out of KCI's I Like Me! personalized reading book ("ILM Book") and KCI's I Like Me! Teacher's Guide ("ILMTG") which were stolen and copied over by DeMoulin and TPA into TPA's A Book About Me personalized reader ("ABAM") and TPA's A Book About Me Curriculum Planner ("ABAMCP").  DeMoulin has countersued KCI for alleged defamation by Vern Wheeler claiming Wheeler was an agent of KCI acting within the scope of his agency when he told a third person that DeMoulin was a "plagiarist."

The court is generally aware of the legal and factual issues that may arise during the course of trial.  This trial brief is submitted to briefly highlight some of those issues as well as address some issues that have not yet been briefed, such as damages.  The damages that may be recoverable in this matter vary depending on the jury's determination of liability under each of the various claims set forth by plaintiff.  Although some of same types of damages may be available for multiple claims of liability, others are unique to the particular cause of action.

## II.    INTRODUCTION.

KCI and TPA entered into a Partnership Agreement in January of 1998 to jointly promote a business whose primary activity was the distribution of ILM and ILMTG ("the ILM Program") to kindergarten classes throughout North America.  The term of the partnership was five years.  Vern Wheeler developed the ILM Book based upon an existing work; however, he made extensive

2

modifications and additions to the book which are original to him. KCI hired DeMoulin several years prior to the Partnership Agreement and DeMoulin had worked extensively with KCI in the development of the Teacher's Guide and in the promotion of the series to the public and in literature. This relationship with DeMoulin continued during the KCI-TPA partnership until interfered with by TPA.

During the KCI-TPA partnership, TPA had continuously requested KCI to provide it with all information concerning the ILM book, its production, sales, customers, etc. which TPA claimed was needed for effective distribution of the book. TPA however vetoed KCI's request to expand the book into Grades 1 and up as originally planned by KCI and requested KCI to limit the book to sales to Kindergarten classes. As part of the Partnership Agreement publicity, Jack Sawka announced that they intended to distribute the book to 3.8 million kindergartners in the U.S. and Canada. After less than a year of the partnership, TPA was satisfied with the book enough to attempt to buy the ILM Program from KCI in November 1998. Unbeknownst to KCI, however, TPA was actively soliciting DeMoulin at this same time to create its own personalized reader. KCI ultimately rejected TPA's offer of purchase in January 1999, after which TPA's executive director, Jack Sawka, held a secret conference with DeMoulin for the purpose of putting together a competing personalized reader program for TPA. This meeting occurred in April 1999, less than one month after DeMoulin had committed himself to KCI under a new Consulting Agreement. KCI was never told about this meeting and was actually deceived by DeMoulin into believing the secret meeting was actually related to business for KCI. About two weeks after this secret meeting, DeMoulin then submitted a written proposal to TPA for a competing personalized reader program. The proposal would allow

3

TPA to get its own personalized reader program off the ground in approximately one year from start to distribution and was based upon DeMoulin's previous work for KCI.

TPA immediately accepted DeMoulin's proposal and then sent notice to KCI that it was "dissolving the partnership" based upon fictitious claims of production problems. At that time, TPA had actually set into motion a plan to develop and market its own competing personalized reader program. To this end, on July 21, 1999 (prior to the end of the KCI-TPA partnership on July 30, 1999) TPA entered into a Consulting Agreement with DeMoulin which was nearly identical to the agreement between DeMoulin and KCI and initiated development of the TPA reader based upon DeMoulin's time table submitted with his proposal. The negotiations leading up to the signing of the TPA-DeMoulin Agreement had been occurring from the time DeMoulin submitted his proposal in April. In the interim, DeMoulin attempted to end his Consulting Agreement with KCI, but in the end DeMoulin decided to work for both parties on identical or substantially similar projects, unbeknownst to KCI. In order to achieve continuity in products while TPA was developing its own competing reader (as well as continued access to KCI's distribution and sales information), TPA induced KCI to enter into a Service Agreement after the Partnership Agreement had terminated. TPA claimed this was more appropriate for their relationship. KCI was never informed of any of the actions by either DeMoulin or TPA toward developing the competing program and in fact only found out in June of 2000 when TPA announced it was canceling the Service Agreement because it had developed its own personalized reader program which consisted of ABAM and ABAMCP.

After these events, DeMoulin claims Vern Wheeler called the University of Tennessee where DeMoulin worked and said that he had a suit against DeMoulin and that DeMoulin is a "plagiarist." KCI is defending the counterclaim upon the basis that Wheeler was not an agent whose actions can

4

be imputed against it at the time of the events giving rise to such claim and, in any event, the statement was true and thus no action upon it can be made. This Trial Brief does not deal with any of DeMoulin's counterclaims which are truly secondary to KCI's claims.

## III.   PLAINTIFF'S CASE AND DAMAGES ISSUES.

### A.   Copyright.

"In order to prevail on a claim of copyright infringement, the plaintiff must show: (1) ownership of a valid copyright, and (2) copying by the defendant of protected components of the copyrighted material." *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 831 (10th Cir. 1993). The evidence at trial will not differ substantially from that presented in the summary judgment pleadings. As the court found in its prior Memorandum Order and Opinion (Doc. # 452), such evidence is sufficient to present a question of fact for the jury to decide.

### 1.   Ownership of a valid copyright.

"A Certificate of Registration, if timely filed, constitutes **prima facie evidence** of the validity of copyright." *Gates Rubber Co. v. Bando Manufacturing of Am., Inc.* , 9 F.3d 823, 831-32 (1993) (emphasis added) (citing 17 U.S.C. § 410(c)). In this case, the certificate of registration for KCI's I Like Me! Teacher's Guide will be admitted into evidence and shows that the registration was made within five years of first publication. The certificate thus constitutes "prima facie evidence . . . of the facts stated in the certificate." Since KCI has established the presumption under 17 U.S.C. § 410(c), "the defendant has the burden of overcoming it." *Gates*, 9 F.3d at 832. Based upon the timely registration, KCI has therefore established prima facie evidence of its ownership in a valid copyright. 17 U.S.C. § 410(c). The defendants will have the burden of rebutting the presumption of originality and showing that KCI does not own a valid copyright in KCI's Teacher's Guide. *See*

5

17 U.S.C. § 410(c); 3 NIMMER ON COPYRIGHT § 12.11[B][1], p. 12-163 to 12-164 (2002). They will fail to present sufficient evidence to overcome the presumption at trial.

With respect to the I Like Me! book, KCI would refer the court to KCI's Response to DeMoulin's Motion for Summary Judgment and Memorandum in Opposition to DeMoulin's Motion for Reconsideration. (*See* Docs. # 369 and #468.) As stated therein, KCI can establish its prima facie case of ownership in a valid copyright through the testimony of Vern Wheeler and the admission of the written assignment/waiver from CBSI with permission to Wheeler to produce the copyrighted derivative work. Thus, in both instances, KCI will be able to establish its prima facie case of the ownership of a valid copyright in both the I Like Me! book and I Like Me! Teacher's Guide.

## 2.    <u>Copying of protected components of copyrighted works.</u>

"This question involves two separate inquiries: 1) whether the defendant, as a factual matter, copied portions of the plaintiff's [work]; and 2) whether, as a mixed issue of fact and law, those elements of the [work] that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *Gates*, 9 F.3d at 831.

In the Court's prior Memorandum Order and Opinion, it indicated that "no rational factfinder could accept any contention of independent creation by DeMoulin" with respect to the A Book About Me and A Book About Me Curriculum Planner due to his access to and level of involvement in the I Like Me! program. (Doc. # 452, p. 12.) Defendants have never contested the issue of actual copying in this case. Thus, the question for the jury is whether DeMoulin copied protected elements of expression from the I Like Me! book and Teacher's Guide over into the A Book About Me book and Curriculum Planner.

6

KCI will present the I Like Me! book and Teacher's Guide as well as the A Book About Me and Curriculum Planner at trial and ask the jury to determine the issue of substantial similarity of protected elements.  As indicated in KCI's prior memorandums and as found in the Court's Memorandum Order and Opinion, there are numerous elements copied over from KCI's books including, among other things, formatting; selection and arrangement of certain words, phrases and themes; appearance; and overall organization.  The issue of copying is clear, the question that the jury will have to answer is whether the protected elements were copied over into the A Book About Me book and Curriculum Planner.  The jury will answer that question in an unequivocal "YES" and find that the defendants copied protected elements of KCI's copyrighted works.  This conclusion will be well supported by a comparison of the books.  As the court noted in its prior Memorandum Order and Opinion, the A Book About Me Curriculum Planner is virtually identical to the I Like Me! Teacher's Guide.  (Doc. # 452, p. 26).  The same is true for the personalized readers.  Thus, the defendants will have no basis to try to take this issue away from the jury or to ask the court to overrule a jury's determination on this issue.

        **3.**    **<u>Damages.</u>**

        **a.**    ***Injunction.***

KCI seeks an injunction on such terms as the court may deem reasonable to prevent or refrain infringement of its copyright. *See* 17 U.S.C. § 502(a).

        **b.**    ***Destruction of all infringing books or curriculum planners.***

To prevent continuing infringement on KCI's copyright, the court will be requested to order the return of all infringing books and curriculum planners. "As part of the final judgment or decree, the court may order the destruction or other reasonable disposition of all copies or phone records

7

found to have been made or used in violation of the copyright owner's exclusive rights." 17 U.S.C.

§ 503(a). This would apply equally to destruction of any computer program or master document

from which additional books or planners could be made.

### c.     *Lost profits and recovery of TPA/Foundation's profits.*

In addition to the above remedies, the copyright owner is entitled to seek its actual damages

including KCI's lost profits as well as any additional profits of the infringer or, in the alternative, a

statutory penalty of between $750 to $30,000 or of up to $150,000 if willful. 17 U.S.C. § 504(a),

(c). "'Willfully' means with knowledge that the defendant's conduct constitutes copyright

infringement. 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 1404[B], at 14-40.2-.3 (1989)."

*Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335 n. 3 (9th Cir. 1990), *cert. denied*,

498 U.S. 1109 (1991).

> With respect to damages, the statute provides:

>> Actual Damages and Profits. --- The copyright owner is entitled to
>> recover the actual damages suffered by him or her as a result of the
>> infringement, and any profits of the infringer that are attributable to
>> the infringement and are not taken into account in computing the
>> actual damages. In establishing the infringer's profits, the copyright
>> owner is required to present proof only of the infringer's gross
>> revenue, and the infringer is required to prove his or her deductible
>> expenses and the elements of profit attributable to factors other than
>> the copyrighted work.

17 U.S.C. § 504(b).

The term "actual damages" is broadly construed to favor victims of infringement. *See*

William F. Patry, Copyright Law and Practice 1167 (1994) ("Within reason, any ambiguities should

be resolved in favor of the copyright owner"); 4 Nimmer § 14. 02 A, at 14-12 ("Uncertainty will not

preclude a recovery of actual damages if the uncertainty is as to amount, but not as to the fact that

8

actual damages are attributable to the infringement"); *Sygma Photo News, Inc. v. High Society Magazine*, 778 F.2d 89, 95 (2d Cir. 1985) (stating that when courts are confronted with imprecision in calculating damages, they "should err on the side of guaranteeing the plaintiff a full recovery").

Actual damages typically are lost profits by the plaintiff as a result of the infringement, regardless of whether the infringer obtained any profit through the infringement. *Gross v Van Dyk Gravure Co.*, 230 F. 412 (2nd Cir. 1916).

Actual damages can also include a licensing fee. "Section 504(b) permits a copyright owner to recover actual damages, in appropriate circumstances, for the fair market value of a license covering the defendant's infringing use." *Davis v. Gap, Inc.*, 246 F.3d 152, 172 (2nd Cir. 2001). This is recoverable as part of the actual damages where it can be shown that the use or license has a fair market value. *Id.* This will be shown in this case through the expert testimony of plaintiff's experts at Grant Thornton, L.L.P. who calculate the fair market value of a license to be $2.15 per book sold by TPA. Thus, for every infringing book distributed by the defendants, they owed KCI a licensing fee of $2.15 per book, which is part of KCI's lost profits as a result of defendants' infringement.

Moreover, since the publication of these infringing books by TPA/Foundation resulted in books in distribution in violation of KCI's licensing fee with Vern Wheeler, an appropriate measure of actual damages includes recovery of the amount Wheeler's licensing fee would have been, so that KCI may meet its obligation of the contract with Wheeler to pay over the sum of $.50 per copy of the book distributed.

Further, as stated in the statute, the profits of the infringer are recoverable if they are "attributable to the infringement." However, the Supreme Court has long held that where the lawful cannot be separated from the unlawful parts of a book, the copyright owner is entitled to recover the

9

defendant's entire profits. *Callaghan v Myers*, 128 U.S. 617, 9 S.Ct. 177 (1888). Once gross

revenue is shown, courts place the burden upon the defendant to show the amount that should be

apportioned between the lawful or unlawful and will generally include the entire amount, unless the

defendant can make a justifiable separation of profits so as to assure to the injured party all that justly

belongs to it. *Harper & Row, Publishers, Inc. v Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218

(1985).

With respect to DeMoulin, his profit would be the amount of money he made under his TPA

Consulting Agreement in producing and promoting the infringing works.

### d.    *Costs and Attorney Fees.*

Pursuant to 17 U.S.C. § 505, "the court in its discretion may allow the recovery of full costs

by or against any party . . . [and] may also award a reasonable attorney's fee to the prevailing party

as part of the costs."

### B.    Breach of Fiduciary Duties.

The essential elements of KCI's breach of fiduciary duty claims against the defendants are:

(1) the existence of a fiduciary relationship; (2) breach of a fiduciary duty; and (3) damages resulting

from such breach. *See generally, Reebles, Inc. v. Bank of America, N.A.*, 29 Kan. App. 2d 205, 209,

25 P.3d 871 (2001). "Generally, there are two types of fiduciary relationships: (1) those specifically

created by contract or by formal legal proceedings and (2) those implied in law due to the factual

situation surrounding the involved transactions and the relationship of the parties to each other and

to the questioned transactions." *Id.* In this case, the evidence will show a fiduciary relationship

arising out of the contractual relationship between the parties. However, the facts are also sufficient

to show an implied in law relationship due to the factual situation in this case where the parties acted

10

in trust and confidence and TPA and DeMoulin then breached that trust by secretly developing a competing personalized reader program.

### 1.    TPA/Foundation.

Under the Kansas Uniform Partnership Act,[1] "[a] partnership is an association of two or more persons to carry on as co-owners a business for profit." K.S.A. 1998 Supp. 56-306(a). The facts will show that KCI and TPA carried on the business of promoting and distributing the I Like Me! program to schools for sale. This is, and was intended by the parties to be, a partnership. It was even described as such in the "Partnership Agreement" and when TPA took action to "dissolve the partnership." TPA will fail to present sufficient evidence to overcome KCI's proof on this issue at trial.

Although TPA tries to make an issue of its profit motive, "TPA admits that its goal was to use any profits to support charitable activities in helping children." (Doc. #416, TPA's Reply in Support of its Cross Motion for Summary Judgement, Response to KCI's Fact #34, p. 46.) This acknowledgment that profits were intended by TPA conclusively proves that KCI and TPA operated "a business for profit." K.S.A. 1998 Supp. 56-306(a). The fact that a nonprofit uses profit obtained from a transaction for charitable purposes does not mean that the activity is any less of a profit-seeking activity than when a for profit organization engages in the same activities; both are engaging in profit-seeking activities. *American Baptist Church of Metropolitan v. Gallaway*, 271 A.D. 2d 92, 710 N.Y.S.2d 12, 15 (N.Y. App. Div. 2000). "What distinguishes a non-profit is not

---

[1]    The court has ruled that under K.S.A. 2002 Supp. 56a-1304(a), the relationship between KCI and TPA, if it is a partnership, is governed by the Kansas Uniform Partnership Act and not the Kansas Revised Uniform Partnership Act. This is inconsequential for purposes of defining a partnership as both KUPA and KRUPA are identical. *Cf.* K.S.A. 2002 Supp. 56a-202(a) *with* K.S.A. 1998 Supp. 56-306(a).

whether it receives money, but what it does with the money." *Id*. Further, TPA's argument that no profit was actually obtained is irrelevant as the only question for the jury is whether the parties intended to make a profit in the partnership. *See* 59A Am. Jur. 2d Partnership § 50, p. 262 (1987). TPA's admission of the profit expectation sufficiently disposes of this element, and TPA's attempt to explain it away are ineffective. Thus, the jury will find a business for profit was intended.

TPA has further tried to claim that it was not a co-owner of the business because the sole property of the partnership was owned by KCI and not jointly with TPA. TPA's arguments miss the point however, as the essential feature of co-ownership is the right to participate in the control over the venture and not the ownership in all property used in the business. *Dalton v. Austin*, 432 A.2d 774, 777 (Me. 1981); 59A Am. Jur. 2d *Partnership* § 154, p. 319, § 155, p. 320 and § 160, p. 324. The fact that one partner owns certain property in the business, or provides the capital, while the other performs certain services, does not preclude a finding that they are co-owners of the business. The concept of co-ownership does not necessarily mean joint title to all business assets. In this case, the evidence will show that not only did TPA have a recognized right to participate in the control over the business, as expressly stated in the Partnership Agreement, but that it actually exercised its rights during the term of the partnership. Based upon this right to participate in the control over the venture, the jury will find that TPA was a co-owner of the business for profit and thus, was KCI's partner.

Once a fiduciary relationship is found, the jury will have no problem finding that TPA breached its fiduciary duties to KCI, especially the duties of loyalty, full disclosure, and good faith and fair dealing. Although under the breach of contract claim TPA will attempt to convince the jury that the ABAM program is not a related product to the ILM program, there will be no doubt in the

12

jury's mind that it dealt directly with the subject matter of the KCI-TPA relationship and was therefore required to be disclosed to KCI. In fact, the jury is likely to find that TPA failed to disclose this information for the purpose of defrauding KCI into providing TPA with the very information TPA then used to directly compete with KCI.

KCI has suffered tremendously from TPA's misconduct. TPA's actions have virtually crippled KCI's ILM program, its business and good will while TPA has been unjustly enriched through its actions in continuing to use the ill-gotten ABAM program for financial gain to the detriment of KCI. KCI's damages are set forth more thoroughly below.

> **2.    DeMoulin.**

The evidence at trial will show that the relationship between DeMoulin and KCI was an agency. "An agency has been defined as a contract, either express or implied, by which one of the parties confides to the other the management of some business to be transacted in his name, or on his account, and by which that other assumes to do the business and to render an account of it." *Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 238 Kan. 384, 390, 710 P.2d 1297 (1985). "Express agency exists when the principal expressly authorizes the agent to do delegable acts . . . ." *In re Appeal of Scholastic Book Clubs, Inc.*, 260 Kan. 528, 533, 920 P.2d 947 (1996). "Under Kansas law, an agency relationship may exist notwithstanding either a denial of the agency . . . or a lack of mutual understanding of agency between the parties." *Id.* In essence, an agency exists where one person (the principal) authorizes another (the agent) to act on his behalf in dealing with third persons concerning a matter and then all actions taken pursuant to such authorization binds the principal. *Professional Lens Plan,* 238 Kan. at 390.

13

The evidence to be presented to the jury will clearly show an agency relationship between KCI and DeMoulin. It was expressly created by the Consulting Agreements between the parties and will further be shown through the testimony of Vern and Carol Wheeler and the employees of KCI. At the very least, as the court has previously recognized, DeMoulin's authorized activities in promoting and publicizing KCI and ILM was an agency relationship. Furthermore, DeMoulin acted as KCI's agent in relation to TPA related to the ILM program on many occasions. In fact, it was during one of these meetings in April of 1999, after signing the Consulting Agreement with KCI, that DeMoulin skirted his fiduciary duties owed to KCI and began working in his own self interest to help TPA secretly develop its own personalized reader program that used KCI's ILM program as its prototype. DeMoulin later promoted the ABAM program over KCI's ILM program in direct violation of his duties owing to KCI. Thus, the jury will have no problem finding numerous breaches of duties, including breaches of the duties of loyalty, full disclosure, honesty, and good faith and fair dealing among others.

The evidence to be adduced at trial will also show the damages caused by DeMoulin's work for a competitor and how his use of confidential information obtained during his relationship with KCI helped TPA create a competing program. The damages from these breaches were significant as set forth in more detail below.

### 3. Damages.

KCI is entitled to recover against TPA and DeMoulin all damages caused by their respective breaches of fiduciary duties. *Noel v. Pizza Management, Inc.*, 258 Kan. 3, 16-17, 899 P.2d 1013 (1995). This includes the lost profits KCI could reasonably have expected to earn had there been no breach of fiduciary duty. *T.A. Pelsue Co. v. Grand Enterprises, Inc.*, 782 F. Supp. 1476, 1487 (D.

14

Colo. 1991). KCI will present evidence showing the lost profits that occurred as a result of TPA/Foundation's and DeMoulin's breaches of fiduciary duties.

KCI's damages also include the consequential damages sustained by KCI as a result of TPA and DeMoulin's actions. The damages to KCI's business resulted when its former partner and agent joined together to develop a competing program. This breach of trust resulted in lost profits when the program which was developed through the breach was placed on the market.

"Any unfair transaction undertaken by one in a fiduciary relationship may result in liability for unjust enrichment of the fiduciary. Where the fairness of a fiduciary transaction is challenged, the burden of proof is upon the fiduciary to prove by clear and satisfactory evidence that such transaction was fair and done in good faith." *Newton v. Hornblower, Inc.*, 224 Kan. 506, Syl. ¶ 9, 582 P.2d 1136 (1978). TPA/Foundation's profits derived from the ABAM program resulted directly from the breach of fiduciary duties in this case and, as such, will be part of the damages recoverable. Further, the secret profit DeMoulin obtained from TPA/Foundation will have to be paid over to KCI as part of the damages in this case.

Furthermore, to prevent future ill-gotten gains to accrue to TPA/Foundation, the court should impose a constructive trust on the ABAM program in favor of KCI as it was developed and obtained as a direct result of the breach of fiduciary duty owed to KCI. *First Nat. Bank and Trust Co. of Oklahoma City v. Sidwell Corp.*, 234 Kan. 867, 875, 678 P.2d 118 (1984).

"Punitive damages, as well as actual damages, are proper where a breach of a fiduciary duty is involved." *Newton*, 224 Kan. 506, at Syl. ¶ 13.

15

## C.    Unfair Competition.

Pursuant to the Court's previous ruling, KCI can establish a claim for unfair competition by proving a prima facie case for copyright infringement and an "extra element" which the Court indicated was either that the unfair competition was accomplished through a breach of confidence or fiduciary duty or that the defendants were acting in the nature of "palming off" KCI's materials that would likely cause consumer confusion, mistake or deception. *Kindergartners Count Inc. v. DeMoulin*, 171 F. Supp. 2d 1183, 1190-93 (D. Kan. 2001). KCI will establish this claim by proving the copyright infringement and breach of fiduciary duty claims as set forth above. Additionally, with respect to DeMoulin in particular, he further breached a confidentiality provision of the Consulting Agreement by using confidential information obtained during his relationship with KCI to help TPA secretly develop the competing program. Further, KCI can also show the alternative element of consumer confusion which will be shown through the testimony of Dr. McConnell as well as the e-mails and other correspondence received from consumers who were actually confused by the materials.

Since this cause of action requires proof of the same elements as copyright infringement, plus the additional element of either breach of fiduciary duty or customer confusion or mistake, the same types of damages are recoverable.

Damages for temporary or permanent harm to KCI or its goodwill by reason of the unfair competition are also recoverable. *See Wichita Wire, Inc. v. Lenox*, 11 Kan. App. 2d 459, 463, 726 P.2d 287 (1986) (recognizing "that goodwill is property and can be damaged" by unfair competition).

**D.     Breach of Contract.**

KCI anticipates that the evidence at trial will be substantially similar to that presented in the summary judgment pleadings with respect to the breach of contract claims against TPA/Foundation and DeMoulin. KCI will also be presenting evidence through the testimony of Vern Wheeler as to the meaning and proper interpretation of the contracts between the respective parties. Further, the jury will use its own common sense and judgment as to whether KCI's interpretation is reasonable and constitutes the agreement of the parties and whether the defendants breached their obligations to KCI by secretly developing and later promoting a competing personalized reader program without KCI's knowledge or approval. Upon review of this evidence, the jury will find that TPA/Foundation and DeMoulin both breached their contractual obligations to KCI by their covert actions.

Another issue for the jury to determine will be the damages recoverable for such breaches. KCI is requesting its expectation interest as damages, as well as incidental and consequential damages caused by such breach. "A party who seeks to recover his expectation interest in the contract is asking to be given the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed. *Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 408, 870 P.2d 686 (1994). In *Source Direct*, the court stated that "[e]xpectation damages usually consist of lost profits plus any incidental or consequential losses caused by the breach." *Id.*

In *MLK, Inc. v. University of Kansas*, 23 Kan. App. 2d 876, 885, 940 P.2d 1158 (1997), the Kansas Court of Appeals recently noted a:

> three-part test, established through fundamental contract principles and lost profit case law, in order to allow a party to recover lost profit damages. First, the lost profits must have been contemplated at the time of contracting. Second, the lost profits must proximately result

17

from a breach or termination of the contract.  Third, the lost profits must be shown with a reasonable degree of certainty.

"The fact damages cannot be calculated with absolute exactness will not render them so uncertain as to preclude an assessment." *Vickers v. Wichita State University*, 213 Kan. 614, Syl. ¶ 2, 518 P.2d 512 (1974).  "Evidence necessary in establishing loss of future profits with reasonable certainty is dependent upon the facts and circumstances of the particular case." *Id.* at Syl. ¶ 3.

"There is an implied undertaking in every contract on the part of each party that each person will not intentionally and purposely do anything  . . . which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Noller v. GMC Truck and Coach Div., General Motors, Corp.*, 13 Kan. App. 2d 13, Syl. ¶ 9, 760 P.2d 688 (1988).  Where a breach of contract is based upon a party's breach of the duty of good faith, damages awarded should place injured party in the same position as if breach had not occurred.  *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 842, 934 P.2d 65 (1997).  This is essentially a benefit of the bargain analysis in which it must be determined what would KCI had received had TPA/Foundation performed its obligations in good faith.

In this case, had TPA/Foundation acted in good faith and given KCI the benefit of the bargain, KCI would have known about the development of a competing program and of TPA/Foundation's intentions of introducing the competing program against KCI and could have acted to prevent the publication.  Further, KCI would have obtained at least the levels of profits anticipated in the contract had TPA/Foundation performed as promised.  Thus, KCI's lost profits for the breach of the duty of good faith and fair dealing includes the difference between what it actually obtained and what it would have obtained had TPA/Foundation faithfully performed the contracts.

18

Further, TPA/Foundation's actions in secretly developing and then promoting a competing personalized reader caused extensive damages to KCI. First, this action was prohibited without KCI's knowledge and approval and deprived KCI of control over the ILM program as required in the Partnership Agreement. Second, it deprived KCI of the benefit of any such development which TPA/Foundation appropriated to its own use. Third, it caused extensive consequential damages to KCI's business that to this day KCI has yet to recover from.

Consequential damages are those that "may fairly be considered as arising, in the usual course of things, from the breach itself," or "may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach." *Kansas State Bank v. Overseas Motosport, Inc.*, 222 Kan. 26, 27, 563 P.2d 414 (1977). Such damages consists of other economic injury the risks of which were foreseen or which should have been foreseen by TPA as a probable result of the breach. *MLK, Inc. v. University of Kansas*, 23 Kan. App. 2d 876, 885, 940 P.2d 1158 (1997); *O'Toole v. Northrop Grumman Corp.*, 305 F.3d 1222, 1226 (10th Cir. 2002). The test for consequential damages is an objective one based upon the foreseeability of the damages resulting from the breach and is not necessarily based upon any tacit agreement or other understandings of the parties. *Id.*

KCI's damages are similar, if not identical in many respects, with the damages recoverable against TPA/Foundation and DeMoulin under the breach of fiduciary duty claim with respect to lost profits of KCI.

With respect to DeMoulin, such breaches caused extensive consequential damages in that TPA/Foundation was able to directly compete with KCI as a direct result of his breach of contract which provided what was rightfully KCI's to TPA/Foundation. DeMoulin was well versed enough

19

in KCI's business to know, or should have known, that handing over a competing program to TPA which intended to use it in competition with KCI would have a devastating effect on KCI's business. DeMoulin knew TPA was going to take an identical product and use the same sales force that promoted the ILM program to then market and sell the identical product to the same audience. The resulting damages were clearly foreseeable at the time this breach occurred.

With respect to TPA/Foundation, the same analysis applies. It should have been clear to TPA/Foundation that substantial damages would be sustained by KCI as a result of its actions. TPA/Foundation was engaged in a relationship with KCI because of its powerful distribution network and ability to get the ILM program to every kindergartner in the United States. However, as a result of the breaches, KCI's ability to grow its company and expand its program were significantly diminished. The initial breach by defendants was devastating. As TPA was well aware, KCI had plans to expand its program to first-graders and to preschoolers; indeed, the first-grade book was already in the development stages. With the lost profits due to the defendants' breaches, KCI was unable to move forward with this production. The lost revenue meant that KCI had to release staff, and the opportunity to grow the company was lost. Further, the breach led directly to the introduction of the competing product and has caused such damage that KCI has not been able to recover to date. This loss was compounded by TPA/Foundations' acquisition of DeMoulin, who was key to KCI's program. The initial breach by TPA/Foundation through the development of their own reader, the breach and interference by all of the defendants, TPA/Foundation's acquisition of DeMoulin, the use of KCI's own funding sources through the information that TPA/Foundation required KCI to provide, and TPA's appropriation of KCI's marketing strategy and market distribution channels, had enormous monetary consequences to KCI.

20

TPA/Foundation chose not to buy KCI's business or product or buy another product and chose instead to develop a competing personalized reader program despite that such action was prohibited by the Partnership Agreement. TPA/Foundation used the same sales force, the same promoter (DeMoulin), the same channels of marketing and distribution and targeted exactly the same audience in marketing an identical product as that which it was marketing for KCI. TPA/Foundation knew or should have known that its decision to develop and distribute a competing product would cripple KCI and its ability to sustain its own program, let alone to go forward with the planned growth and expansion as planned and discussed with TPA/Foundation. TPA/Foundation's breach resulted in a significant loss of future profits which would have been attained but for TPA/Foundation's actions in breaching the contracts with KCI and such losses were a direct and proximate consequence of TPA/Foundation's breach.

### E.     Tortious Interference.

As provided in KCI's prior submissions to the court in its summary judgment pleadings, and as previously ruled on by the Court, there is more than sufficient evidence to support a finding of liability against each defendant under the tortious interference counts against TPA/Foundation and DeMoulin. KCI anticipates that the evidence presented at trial on these claims will be substantially the same as that set forth in its summary judgment pleadings.

With respect to the damages element, the same principals apply to a claim for tortious interference as in contract, except that the one who interferes, rather than the contracting party, pays the damages. The question is what are the "damages suffered by plaintiff as a direct or proximate result of defendant's misconduct." *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986). This issue turns essentially on the value of the expectancy that the plaintiff had in the absence of

21

defendant's misconduct.   In other words, from TPA/Foundation the plaintiff can recover its expectation from the DeMoulin contract, and from DeMoulin the plaintiff can recover its expectation from the TPA/Foundation contracts.  Thus, the liability assessed against TPA/Foundation for its breach of the Partnership and Service Agreements will set the damages recoverable against DeMoulin and the damages recoverable against DeMoulin for his breach of the Consulting Agreement will set the damages recoverable against TPA/Foundation.

F.      **Fraud by TPA/Foundation.**

The court is already well aware of the liability issues surrounding KCI's fraud claims against TPA/Foundation and, as such, KCI will not go into further detail here.  However, there are numerous damages issues that are likely to arise in this case as a result of the fraud.

In fraud cases, the measure of damages is the difference between the value actually obtained from TPA/Foundation and what would have been the obtained value if the false representations had been true.  *See Hoffman v. Haug*, 242 Kan. 867, 752 P.2d 124 (1988).

In this case, KCI includes a claim, found within the Pretrial Order, based upon among other things, the failure to meet the distribution requirements and failure to promote.  Thus, if this fraud is proven then KCI is entitled to recover the damages related to the fraudulent promise of TPA that they would meet these requirements.

Furthermore, TPA/Foundation obtained, through fraud, unfettered access to all the confidential business information needed to create a competing personalized reader program including, but not limited to, its structure, customer base, funding and operational know-how. TPA/Foundation then perpetuated the fraud by covering up the fact that it was creating a competing program and stringing KCI along until the competing program was unveiled.  This again was done

through promises of reaching the distributional goals and further allowed TPA/Foundation to develop the network it needed to get its own personalized reader program off the ground. This damaged KCI through the profits it should have obtained had the promises been true.

TPA/Foundation has also been unjustly enriched through its fraud (both fraudulent misrepresentations and fraud by silence) which allowed it to clone the ILM program and secretly create its own competing personalized reader program without paying any consideration for the property obtained. The value of the ABAM program is the measure of damages for TPA/Foundation's fraud which allowed it to obtain the property without paying for such right. 37 Am. Jur. 2d *Fraud and Deceit* § 435, p. 425 (2001).

The value of the property TPA took was at least the amount it would have had to pay in licensing fees to rightfully produce and sell the books making up the ABAM program. In addition, the value of KCI's confidential and proprietary information and property which helped to establish the ABAM program should be measured by comparing the profits TPA made and the reasonable value that one would place upon the information which would produce such profits. Considering the ILM program (i.e., the books and business knowledge) was KCI's entire business, TPA's actions essentially stole and replicated for itself KCI's business. TPA's actions were such that a reasonable jury would find that having failed to come to terms to buy KCI's business, TPA then set out on a plan to steal it away from KCI instead. Thus, KCI would propose to value this damage as the value of KCI's business at the time of the fraud. As the court is aware from the summary judgment pleadings in this case, the jury will hear evidence concerning the negotiations between KCI and TPA immediately before the termination of the KCI-TPA partnership. This series of negotiations will set the benchmark as the value of KCI's business that TPA obtained through its fraud.

23

### G.     Punitive Damages.

If KCI prevails on any of the claims of intentional torts, punitive damages may be recovered. "In Kansas, punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs." *Golconda Screw, Inc. v. West Bottoms Ltd.*, 20 Kan. App. 2d 1002, 1007, 894 P.2d 260 (1995). "The conduct giving rise to the punitive damages claim must be the same conduct for which actual or compensatory damages were allowed. Where two separate causes of action are tried, arising from different factual situations and different theories, recovery of actual damages in one cause of action is insufficient to permit recovery of punitive damages in the second cause of action." *Traylor v. Wachter*, 227 Kan. 221, 224-25, 607 P.2d 1094 (1980).

KCI will submit its litigation expenses along with the other factors for the jury's consideration of the appropriate level of punitive damages to award in this case. The Kansas Supreme Court has long adhered to the holding that litigation expenses, including the amount of attorneys fees, is a proper factor for consideration by the jury in accessing punitive damages against the defendant. *Smith v. Printup*, 262 Kan. 587, 601, 938 P.2d 1261 (1997). In this regard, the court has found that:

> "An award of punitive damages must be reviewed in the light of the actual damages sustained, the actual damage award, the circumstances of the case (the nature, extent, and enormity of the wrong), the intent of the party committing the wrong, the relative positions of the plaintiff and the defendant, the defendant's financial worth, and the *plaintiff's probable litigation expenses*. When reviewing punitive damages, any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such

24

damages." (Emphasis added.) *Cerretti v. Flint Hills Rural Electric Co-op. Ass'n*, 251 Kan. 347, 366, 837 P.2d 330 (1992).

*Smith*, 262 Kan. at 601.

## IV.    CONCLUSION

WHEREFORE, plaintiff requests the court take into consideration the legal authorities and arguments herein as the trial in this matter progresses.

Respectfully submitted,

Harold S. Youngentob - #08904
Anne M. Kindling, #16140
Nathan D. Leadstrom, #20294
GOODELL, STRATTON, EDMONDS
    & PALMER, L.L.P.
515 S. Kansas Avenue
Topeka, KS 66603
(785) 233-0593
(785) 233-8870 (fax)
Attorneys for Plaintiff Kindergartners Count, Inc.

25

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the __10__ <sup>th</sup> day of March, 2003, a true and correct copy of the above and foregoing Plaintiff's Trial Brief was served by facsimile transmission to the following:

John M. McFarland
Lathrop & Gage, L.C.
2345 Grand Boulevard, Suite 2500
Kansas City, MO 64108
Fax:  816/292-2001
*Attorneys for Defendant Donald F. DeMoulin*

Molly Moran
Richard P. Steinken
Jenner & Block, LLC
One IBM Plaza, Suite 4200
Chicago, IL 60611
Fax: 312/840-7285 - Ms. Moran
*Attorneys for Telephone Pioneers of America*

Brian Boos
Gehrt & Roberts, Chtd.
5601 SW Barrington Court, South
P O Box 4306
Topeka, KS 66604-0306
Fax: 785/273-8560
*Attorneys for Vernie L. Wheeler*

Thomas Wright
Evelyn Z. Wilson
Wright, Henson, Somers,
 Sebelius, Clark & Baker, LLP
100 SE 9th Street, 2nd Floor
P O Box 3555
Topeka, KS 66601-3555
Fax: 785/232-3344
*Attorneys for Telephone Pioneers of America*

Harold S. Youngentob
Anne M. Kindling

26